Filed 9/23/25  P. v. Lizarraga CA2/5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JONATHAN LIZARRAGA,<br><br>　　　Defendant and Appellant. | B344269<br><br>(Los Angeles County<br>Super. Ct. No.<br>TA148176) |

　　　APPEAL from an order of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Affirmed.

　　　Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Bryne and Stephanie C. Brenan, Supervising Deputy Attorneys General, for Plaintiff and Respondent.

Following his no contest plea to first degree murder, the trial court sentenced defendant and appellant Jonathan Lizarraga (defendant) to 25 years to life in prison. Three years later, defendant was diagnosed with advanced lymphoma, which had spread to other parts of his body. The California Department of Corrections and Rehabilitation (CDCR) recommended the trial court recall defendant's sentence under the compassionate release provisions of Penal Code section 1172.2.[1] The trial court held a hearing, found defendant suffered from a serious and advanced illness with an "end-of-life trajectory," but declined to recall his sentence because it believed defendant posed an unreasonable risk of danger to public safety. We consider whether the court's danger determination was an abuse of its discretion.

## I.  BACKGROUND

*A.  Defendant's Arrest, Conviction, and Behavior While Incarcerated*

On October 28, 2018, at approximately 7:35 a.m., surveillance cameras captured David Ramirez bicycling back to a vehicle where defendant and Nery Alexander (Alexander), both 18th Street gang members, were waiting for him. Ramirez was shot and killed when he arrived in the place where defendant and Alexander were waiting.

---

[1]     Undesignated statutory references that follow are to the Penal Code.

2

Alexander and another gang member identified defendant as the person who shot Ramirez. The Los Angeles County District Attorney charged defendant with murdering Ramirez and a series of other crimes committed in the month following Ramirez's death—including attempted murder, forcible rape and forcible oral copulation, and dissuading a witness by force or threat. The information against defendant alleged section 12022.53 firearm enhancements in connection with the murder, rape, and witness intimidation charges, and further alleged all the offenses were gang related. At the time of his arraignment, defendant was 28 years old.

During defendant's pre-trial incarceration in county jail, he accumulated a number of major disciplinary infractions including infractions for fighting (in August 2019, November 2019, and October 2020) and for creating a disturbance and refusing to follow orders.

In January 2021, pursuant to a negotiated disposition, defendant pled no contest to the first degree murder of Ramirez in exchange for dismissal of the remaining counts and special allegations.[2] Pursuant to the plea agreement, the trial court sentenced defendant to 25 years to life in prison.

---

[2]     In a report filed concurrently with the plea hearing, the Probation Department recounted defendant's criminal history prior to Ramirez's murder. That history includes juvenile arrests (for vehicle theft, drug possession, and vandalism) and adult convictions (for carrying a loaded firearm, multiple convictions for being a felon in possession of a firearm, and multiple convictions for possessing controlled substances). The report also revealed that much of defendant's criminal history was carried out while on probation, parole, or community supervision.

In prison after sentencing, defendant accumulated several "Rules Violation Reports." In July 2021, he was reported for committing battery on a prisoner; in August 2022, he was reported for possessing a deadly weapon; and in July 2023, he was reported for fighting. Correction authorities, however, determined defendant was no longer an active member of the 18th Street gang as of September 2024.

### B. *Request for Compassionate Release*

In a letter dated December 25, 2024, CDCR's director of health care services recommended recall of defendant's sentence and a grant of compassionate release pursuant to section 1172.2. CDCR explained defendant had been diagnosed in March 2024 with "far advanced lymphoma," which was a "serious and life-threatening" form of cancer that had "spread to involve his liver, his colon, his abdominal cavity, his bladder, and his spine."

Attached to CDCR's recommendation were (among other things) a diagnostic study report summarizing defendant's criminal history, institutional adjustment, and medical evaluation; a compassionate release request authored by doctors at defendant's prison; and a copy of the probation officer's report filed at the time of defendant's plea. The attachments indicate defendant had been relocated from prison to an outside hospital due to severe abdominal pain as a result of his tumors. Notwithstanding the pain, however, the attachments stated defendant remained able to "perform his activities of daily living. He can bath[e], dress and eat on his own . . . [although] his pain limits his efforts. He has used a wheelchair intermittently, but now requires it most of the time when not in bed." The attached diagnostic study indicated that, prior to being relocated to the

4

outside hospital, defendant had been categorized as a Level 4 inmate requiring "close custody,"[3] and his California Static Risk Assessment score was the highest score possible.

In a follow-up letter dated February 12, 2025, CDCR's director of health care services advised that defendant's "disease has continued to spread despite chemotherapy and is now considered refractory to 2 different chemotherapy regimes." CDCR further advised that defendant was not a candidate for a bone marrow transplant and his lymphoma had grown "so extensively that part of his bowel had to be removed." At the same time, CDCR also reported defendant's oncologist had suggested he undergo a promising and innovative form of immunotherapy ("chimeric antigen receptor T-cell therapy" or CAR-T treatment). CDCR cautioned, however, that the benefits from CAR-T treatment may be "less robust" for defendant given his "extensive list of complications" including severe infections, a urinary obstruction, tumor growth, and pulmonary embolisms. "Overall," CDCR concluded, defendant's "chance of dying remain[s] greater than his chance of being cured. . . . [Defendant] remains very seriously ill, has an end-of-life trajectory, and is likely to die from his diffuse large B-cell lymphoma."

The People opposed the recommendation for compassionate release. The People argued defendant's criminal history, his poor performance while on probation, and his disciplinary record while incarcerated meant he would still pose a danger to public

---

[3] Level 4 inmates require the "maximum" level of security in the general prison population. (See generally *People v. Whalen* (2013) 56 Cal.4th 1, 23.)

safety—notwithstanding his cancer diagnosis—because he was still physically able to perform many activities of daily living.

   C.    *Hearing on the Request for Compassionate Release*
   On February 14, 2025, the trial court held a hearing on defendant's section 1172.2 compassionate release request.  The People called three witnesses: Dr. Ronald Zhang, a primary care prison physician who authored the compassionate release recommendation; Laurie Cobarrubia, a registered nurse who was coordinating defendant's care and CAR-T treatment; and Oscar Villareal, a detective with the Los Angeles Police Department and the investigating officer for Ramirez's murder.
   Dr. Zhang testified he last saw defendant one or two months before the hearing; at that time, defendant was able to perform the "activities of daily living," i.e., he could bathe himself, dress himself, and feed himself.  Although he could not testify about defendant's then-current ability to care for himself, Dr. Zhang stated defendant was "on a deteriorating[,] downward trajectory in terms of his medical health" and was transferred to an outside hospital because he could not take care of himself in prison.
   Nurse Cobarrubia, who saw defendant every day on rounds, testified he was "alert and oriented to person, place, time and everything going on."  She testified further defendant was able to perform the activities of daily living on his own.  Although defendant was not allowed to move freely throughout the hospital's hallways, he was able to traverse his "fairly large," two-bed hospital room without assistance.  She stated that while CAR-T treatment offered defendant a "very good chance" to cure his cancer, he had elected to defer the start of the treatment until

6

after the hearing even though the delay could cost him his life. The nurse testified defendant delayed in the hope that he would be released and able to return home to his family before beginning the treatment. But in the meantime, defendant had suffered a relapse and was undergoing more chemotherapy in an effort to get his cancer back into remission, which is a prerequisite for undergoing CAR-T treatment.

Detective Villareal's testimony primarily concerned photos and videos of defendant posted on his public-facing Facebook account during the period from September 2023 to February 2024. According to Detective Villareal, many of the images showed defendant with tattoos and making hand signs associated with the 18th Street gang. On cross-examination, Detective Villareal conceded he did not know when the photographs were taken, only when they were posted on social media. Detective Villareal also testified about a recorded call defendant made from prison on January 16, 2025, in which he stated doctors had told him he had a "70 percent chance of beating cancer."

Defendant presented only one witness, Dr. Michele DiTomas, CDCR's assistant deputy medical executive for palliative care. Dr. DiTomas testified that after reviewing defendant's medical records and speaking with his oncologist, she had determined his "chance of dying [wa]s significantly greater than his chance of a cure." She opined that if defendant went into remission and received CAR-T treatment but did not respond to the treatment, he would have less than six months to live; if he responded to the treatment but only incompletely, he would probably die within two years. She explained that even in the best case scenario, "there's a better chance that [defendant] will die, than [that] he will live.

In addition to Dr. DiTomas's testimony, defendant submitted several documents, including copies of CDCR's compassionate release letters, an external movements report showing defendant's custodial assignments between 2015 and 2017, and an accommodations report listing the various items of medical equipment provided to defendant between 2021-2025. Defendant did not submit any documents attesting to his efforts at rehabilitation while in prison.

The trial court also heard victim impact statements from Ramirez's daughter and her mother, both of whom stated they would not feel safe if defendant were released.

The trial court found that while defendant met section 1172.2's eligibility requirement for an "end-of-life trajectory," he was not entitled to compassionate release because he posed an unreasonable risk of danger to public safety. (See generally § 1172.2, subd. (b) ["There shall be a presumption favoring recall and resentencing under this section if the court finds that the facts described in paragraph (1) or (2) exist, which may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18, based on the incarcerated person's current physical and mental condition. . . . [¶] (1) The incarcerated person has a serious and advanced illness with an end-of-life trajectory. Examples include, but are not limited to, metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced end-stage dementia"].) The trial court cited several factors in support of its public safety finding: defendant's ability to care for himself, including walking on his own; defendant's gang association; defendant's lack of remorse for killing Ramirez; defendant's criminal history, including his

8

multiple firearm-related convictions; and defendant's record of violence while incarcerated. The court clarified on the record, however, that it's denial of compassionate release was made "without prejudice."[4]

## II. DISCUSSION

The trial court's finding that defendant remained a danger to public safety notwithstanding his cancer diagnosis was not an abuse of discretion. (*People v. Lewis* (2024) 101 Cal.App.5th 401, 409 [reviewing compassionate release determination for abuse of discretion].) At the time the court ruled, defendant (then age 34) had the physical capacity to care for himself without the assistance of hospital staff and walk short distances unaided, and he remained able to think logically and communicate clearly. Just as important, defendant had a long history of violent behavior that had not significantly abated even while in custody, which explains his recidivism score and categorization as an inmate requiring "close custody." These facts justify the court's conclusion that defendant posed too great a risk of committing another homicide (including attempted homicide or solicitation to commit murder).

Section 1172.2 authorizes a court to recall the sentence of an incarcerated person who has a "serious and advanced illness with an end-of-life trajectory," including "metastatic solid-tumor

---

[4] The court did not specify what it meant by "without prejudice," and it made the comment only after a pause in the proceedings. Presumably, the court meant to leave open the possibility that it may reevaluate the propriety of compassionate release after some additional period of time.

cancer," or is "permanently medically incapacitated with a medical condition or functional impairment that renders them permanently unable to complete basic activities of daily living." (§ 1172.2, subds. (b)(1) & (2).)  If the trial court finds that an incarcerated person has a qualifying illness or condition, the statute establishes a presumption favoring recall and resentencing that can be overcome if the trial court finds the individual "is an unreasonable risk of danger to public safety." (§ 1172.2, subd. (b).)

An "unreasonable risk of danger to public safety" means an unreasonable risk that the individual will commit "eight types of particularly serious or violent felonies, known colloquially as 'super strikes.'"  (*People v. Valencia* (2017) 3 Cal.5th 347, 351 & fn. 3 ["The felonies commonly referred to as super strikes are (1) a "'sexually violent offense,'" as defined in Welfare & Institutions Code, section 6600, subdivision (b); (2) oral copulation or sodomy, or sexual penetration of a child under 14 years of age and more than 10 years younger than the defendant, as defined in sections 286, 288a and 289; (3) a lewd or lascivious act involving a child under 14 years of age, in violation of section 288; (4) any homicide offense, including attempted homicide, as defined in sections 187 to 191.5; (5) solicitation to commit murder, as defined in section 653f; (6) assault with a machine gun on a peace officer or firefighter, as defined in section 245, subdivision (d)(3); (7) possession of a weapon of mass destruction, as defined in section 11418, subdivision (a)(1); and (8) any serious and/or violent felony offense punishable in California by life imprisonment or death. [Citation.]"].)

Despite the severity of defendant's cancer diagnosis, the trial court reasonably found defendant retains the mental and

10

physical capacity to either commit (or conspire to commit) a super strike offense. The recording of his January 2025 telephone call from the hospital revealed he was able to communicate clearly and effectively. Nurse Cobarrubia testified he was mentally alert and oriented to everyone and everything around him. In addition, she and Dr. Zhang each testified defendant had the ability to care for himself, walk unaided for short distances, and use a wheelchair for longer distances. (Compare *Nijmeddin v. Superior Court* (2023) 90 Cal.App.5th 77, 82, 83 [trial court abused its discretion in refusing to grant compassionate release where the 65-year-old petitioner was "severely physically incapacitated," i.e., "too ill to get out of bed" and "'barely able to get out of the chair,'" and within weeks will likely require "24-hour support"]; *Lewis*, *supra*, 101 Cal.App.5th at 404, 406, 409 [reversing denial of compassionate release request because the 37-year old petitioner's speech was increasingly "garbled" and he "struggl[ed] to communicate on the phone," he had "lost the ability to use his arms," and was "dependent on medical staff to 'do everything for him'"].) With this level of ability, defendant could still readily commit a homicide with a firearm (as he had before).

This level of continued physical and mental ability that would allow defendant to commit a homicide was coupled with a demonstrated history of violent and dangerous behavior. Defendant had already committed one murder, and though he now characterizes that crime as an "outlier," that does not reckon with his multiple prior firearm-related offenses and repeated violent conduct during the three-and-a-half years he had (by then) been in custody for murdering Ramirez. Indeed, other than perhaps CDCR's determination that defendant was no longer in

11

the 18th Street gang as of September 2024 (i.e., while in custody), there was no evidence before the trial court suggesting defendant had engaged in programming that might reduce his violent impulses if released. To the contrary, the evidence in the diagnostic study and evaluation report that was before the court concerning defendant's in-custody rules violations (including a violation for fighting in July 2023, just 16 months before CDCR recommended compassionate release) and risk of recidivism suggested the opposite. (Compare *Lewis*, *supra*, 101 Cal.App.5th at 406 [reversing denial of compassionate release request, in part, because "Lewis had 'no write-ups' documented during his current term of imprisonment"].) Defendant's violent predisposition, combined with the evidence of his remaining mental and physical capacity, justifies the trial court's determination that he posed an unreasonable risk to public safety at the time the court ruled.

## DISPOSITION

The trial court's order is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

HOFFSTADT, P. J.          KIM (D.), J.

12